# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR19-4003-LTS |
| Plaintiff, | |
| vs. | **MEMORANDUM** |
| BRADLEY EUGENE MCPEEK, SR., | **OPINION AND ORDER** |
| Defendant. | |

---

## I. INTRODUCTION

This case is before me on a motion (Doc. 51) and amended motion (Doc. 65) for compassionate release filed by defendant Bradley Eugene McPeek, Sr. After conducting an initial review, I appointed counsel on December 6, 2021. Doc. 61. Counsel filed an amended motion (Doc. 65) and a supporting brief (Doc. 66). The Government then filed a response (Doc. 67), to which McPeek replied (Doc. 68). The Government filed a supplemental resistance (Doc. 69) on January 4, 2022, and McPeek responded (Doc. 71). Oral argument is not necessary. *See* Local Rule 7(c).

## II. BACKGROUND

On January 27, 2020, I sentenced McPeek to 84 months' imprisonment on one count of conspiracy to distribute a substance or mixture containing a detectable amount of methamphetamine which contained 50 grams or more of actual (pure) methamphetamine within 1,000 feet of a protected location. Doc. 45 at 1. McPeek's advisory guidelines range was 151 to 188 months but I granted a downward variance to 126 months due to McPeek's age, methamphetamine dependence, military service, pre-sentence rehabilitation, recent personal tragedies and lack of criminal conduct between

2006 and 2017. Doc. 46 at 1-3. Pursuant to a Government motion, I then reduced the ultimate sentence to 84 months, along with six years of supervised release. *Id.* at 2; Doc. 45 at 3. According to the online Bureau of Prisons (BOP) inmate locator, McPeek is incarcerated at FCI Terre Haute in Terre Haute, Indiana, and has a scheduled release date of August 1, 2025.

McPeek filed his first motion on August 2, 2021, requesting compassionate release due to prostate cancer. Doc. 51. After I appointed counsel for McPeek, counsel filed an amended motion and supporting brief. Docs. 65, 66. In its response, the Government neither advocated for or against compassionate release. Instead, it stated that McPeek's "motion for a sentence reduction should be carefully considered" and that I could "possibly" delay a ruling "for receipt of further timely information regarding the execution of [the] BOP's medical treatment plan." Doc. 67 at 13.

In his reply, McPeek provided additional information regarding his eligibility for medical care through the Department of Veterans Affairs. Doc. 68. The Government then filed a supplemental response (Doc. 69), changing its position and arguing that I should deny McPeek's motion. McPeek has replied (Doc. 71).

## III. COMPASSIONATE RELEASE STANDARDS

A court's ability to modify a sentence after it has been imposed is extremely limited. One way a court may modify a sentence is through "compassionate release" as outlined in 18 U.S.C. § 3582(c)(1)(A), which was modified by the First Step Act of 2018 (FSA). *See* Pub. L. No. 115-391, § 603. In the past, 18 U.S.C. § 3582(c)(1)(A) permitted a court to reduce a defendant's term of imprisonment only upon the motion of the Director of Bureau of Prisons (BOP). The FSA modified § 3582(c)(1)(A) such that a defendant may now directly petition the court "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *See Mohrbacher v. Ponce*, No.

2

CV18-00513, 2019 WL 161727, at *1 (C.D. Cal. Jan. 10, 2019) (discussing modifications made to § 3582(c)(1)(A) by the FSA).

If a defendant fully exhausts administrative remedies, the court may, upon motion of the defendant, reduce the defendant's sentence, after considering the factors set forth in 18 U.S.C. § 3553(a) to the extent they are applicable, if the court finds that:

> (i) extraordinary and compelling reasons warrant such a reduction; or
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
> And that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . .

18 U.S.C. § 3582(c)(1)(A); *see also United States v. Vangh*, 990 F.3d 1138, 1140 (8th Cir. 2021). McPeek does not meet the requirements of § 3582(c)(1)(A)(ii), as he is under 70 years of age and has not served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c). Thus, his only possible avenue for relief is § 3582(c)(1)(A)(i), which he invokes due to his medical condition. Doc. 66 at 2.

The starting point in determining what constitutes "extraordinary and compelling reasons" under § 3582(c)(1)(A)(i) is the Sentencing Guideline discussing compassionate release issued by the United States Sentencing Commission. *See* U.S.S.G. § 1B1.13; *see also United States v. Rivernider*, No. CR10-222, 2019 WL 3816671, at *2 (D. Conn. Aug. 14, 2019). The Guideline provides that extraordinary and compelling reasons exist for the defendant's medical condition due to:

> (i) The defendant is suffering from a terminal (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
> (ii) The defendant is

3

> (I) suffering from a serious physical or medical condition,
> (II) suffering from a serious functional or cognitive impairment, or
> (III) experiencing deteriorating physical or mental health because of
>    the aging process,
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which [the defendant] is not expected to recover.

U.S.S.G. § 1B1.13 cmt. n.1(C).

This Guideline predates the FSA and has "not been amended to reflect that, under the FSA, a defendant may now move for compassionate release after exhausting administrative remedies." *Rivernider*, 2019 WL 3816671, at *2. However, the Eighth Circuit has explained that § 1B1.13 and its commentary "may not be ignored" but "is advisory not prohibitive." *United States v. Marcussen*, 15 F.4th 855, 859 (8th Cir. 2021). Thus, the Guideline and commentary notes are "relevant but not binding," and considering them is appropriate "[s]o long as a district court does not explicitly limit its discretion to the factors identified in USSG § 1B1.13 and its commentary." *Id.*

## IV.    DISCUSSION

### A.    *Exhaustion of Administrative Remedies*

McPeek submitted an administrative request for compassionate release to his warden on July 29, 2021, which was denied on October 28, 2021. Doc. 51 at 10; Doc. 66-2. I find he has exhausted his administrative remedies as required by § 3582(c)(1)(A).

### B.    *Extraordinary and Compelling Reasons*

#### 1.    *McPeek's Medical History*

McPeek is 63 years old. At the time of the presentence investigation report (PSIR), he suffered from glaucoma. Doc. 37 at 22. He had no other ongoing health issues but had a history of gastrointestinal issues and routine surgeries. *Id.* The PSIR

4

noted that McPeek has a family history of cancer, stating that his mother had died of leukemia. *Id.*

On January 14, 2021, the BOP took a sample of McPeek's blood that showed he had an elevated prostate-specific antigen[1] (PSA) level. Doc. 66-3 at 101. The report, dated January 15, 2021, flagged his PSA level of 9.81 ng/mL as "high." *Id.* According to the National Cancer Institute, a higher PSA level makes prostate cancer more likely and a continuous rise in PSA levels may be a sign of prostate cancer.[2] However, while useful in detecting possible prostate cancer, "PSA is a prostate-specific but not [prostate-cancer (PC)]-specific," meaning that an elevated PSA of over 4.0 ng/mL leads to a PC diagnosis about 30% of the time and a PSA under 4.0 ng/mL misses "about 15% of PC cases, including 2.3% of clinically significant PC cases."[3] In fact, "[i]n addition to prostate cancer, a number of benign (not cancerous) conditions can cause a [person's] PSA level to rise. The most frequent benign prostate conditions that cause an elevation in PSA are prostatitis (inflammation of the prostate) and benign prostatic hyperplasia (BPH) (enlargement of the prostate)."[4]

A BOP provider met with McPeek on March 4, 2021, to review his elevated PSA level. Doc. 66-3 at 51. At that appointment, McPeek stated that he did not have difficulty with urination but did have to urinate several times a night. *Id.* He also denied having

---

[1] Prostate-specific antigen "is a protein produced by normal, as well as malignant, cells of the prostate gland." Prostate-Specific Antigen (PSA) Test, National Cancer Institute (last updated Feb. 24, 2021), https://www.cancer.gov/types/prostate/psa-fact-sheet.

[2] Prostate-Specific Antigen (PSA) Test, National Cancer Institute (last updated Feb. 24, 2021), https://www.cancer.gov/types/prostate/psa-fact-sheet.

[3] Yan, Yiwu et al., *On the Road to Accurate Protein Biomarkers in Prostate Cancer Diagnosis and Prognosis: Current Status and Future Advances*, 22(24) INT'L J. MOLECULAR SCI. 13537 (2021).

[4] Prostate-Specific Antigen (PSA) Test, National Cancer Institute (last updated Feb. 24, 2021), https://www.cancer.gov/types/prostate/psa-fact-sheet.

5

any groin pain or urinary retention or bleeding. *Id.* Johns Hopkins Medicine explains that "early warning signs of prostate cancer are rare," and "[t]he severity of symptoms may depend on where the cancer is located in the prostate and how advanced it has become."[5] Johns Hopkins lists "[a] need to urinate frequently, especially at night" as a urinary symptom of prostate cancer.[6] At the March 4, 2021, appointment McPeek elected not to submit to a digital rectal exam. *Id.* He was diagnosed with an unspecified disorder of the prostate and scheduled for an offsite specialist urology appointment with a target date of April 30, 2021. *Id.* at 52.

On April 14, 2021, the BOP collected another blood sample, which showed that McPeek's PSA level had risen to 10.13 ng/mL, again categorized as "high." *Id.* at 99. According to the American Cancer Society, "[i]f the PSA is more than 10, the chance of having prostate cancer is over 50%."[7] These new test results were not reported to the offsite urologist McPeek saw on April 27, 2021. Doc. 66-3 at 145. At that appointment, urologist Dr. Telle performed a digital rectal exam, finding "a bit of a slight firmness to the right mid gland area." *Id.* at 146. Based on the exam and McPeek's prior PSA level of 9.81 ng/mL, Dr. Telle explained to McPeek "that there is by PSA testing around a 22-25% chance that he could have prostate cancer." *Id.* McPeek elected to proceed with a biopsy to determine whether he had cancer. *Id.*

Upon his return to FCC Terre Haute, a provider there noted that McPeek's working diagnosis was "elevated PSA," that it was "unknown" whether a return appointment was requested, and that there was "no paperwork" with McPeek regarding "new orders." *Id.* at 41. On April 30, 2021, the BOP added the report from the offsite

---

[5] Prostate Cancer Symptoms, Johns Hopkins Medicine (last visited Jan. 7, 2022), https://www.hopkinsmedicine.org/health/conditions-and-diseases/prostate-cancer/prostate-cancer-symptoms

[6] *Id.*

[7] Screening Tests for Prostate Cancer, American Cancer Society (last updated Jan. 4, 2021), https://www.cancer.org/cancer/prostate-cancer/detection-diagnosis-staging/tests.html

urology consultation to McPeek's file. *Id.* at 39. The BOP cited the urology consultation note and McPeek's elevated PSA as cause to schedule a prostate biopsy with a scheduled target date of June 17, 2021. *Id.* A BOP provider also added an offsite consultation review note on May 3, 2021, stating that McPeek already had a urology consultation and he was "[s]cheduled for prostate biopsy for history of elevated PSA." *Id.* at 38.[8]

McPeek did not undergo a prostate biopsy until June 28, 2021. *Id.* at 139. A BOP provider took another blood sample on June 30, 2021, which showed that McPeek's PSA level had risen to 28.64 ng/mL. *Id.* at 93. Because "[p]rostate biopsies and prostate surgery also increase PSA level,"[9] it is unclear why the BOP took this sample two days after McPeek's biopsy. In any event, Dr. Telle diagnosed McPeek with prostate cancer on July 6, 2021, after receiving McPeek's biopsy report. *Id.* at 136.

The report showed that eight of the twelve tissue samples were positive for adenocarcinoma and the Gleason score for those samples was $3+3=6$. *Id.* Cancer grading "describes how abnormal the cancer cells look under a microscope and how quickly the cancer is likely to grow and spread."[10] A Gleason score is graded by checking

> the prostate tissue samples to see how much the tumor tissue is like the normal prostate tissue and to find the two main cell patterns. The primary pattern describes the most common tissue pattern, and the secondary pattern describes the next most common pattern. Each pattern is given a grade from 3 to 5, with grade 3 looking the most like normal prostate tissue and grade 5 looking the most abnormal. The two grades are then added to get a Gleason score.[11]

---

[8] During this period, McPeek had other routine medical appointments, including presenting to a BOP medical provider with anxiety attacks on May 18, 2021. *Id.* at 35. McPeek also received a new prescription for nebulizer treatments due to his Chronic Obstructive Pulmonary Disease (COPD) on June 10, 2021.

[9] Prostate-Specific Antigen (PSA) Test, National Cancer Institute (last updated Feb. 24, 2021), https://www.cancer.gov/types/prostate/psa-fact-sheet.

[10] *Id.*

[11] Prostate Cancer Treatment (PDQ®)-Patient Version, National Cancer Institute (last updated Nov. 12, 2021), https://www.cancer.gov/types/prostate/patient/prostate-treatment-pdq.

Gleason scores range from six to ten and the higher the score, "the more likely the cancer will grow and spread quickly. A Gleason score of 6 is a low-grade cancer."[12]

The biopsy lab report also gave McPeek's results a ProstaVysion[13] score of six. Doc. 66-3 at 134. A ProstaVysion score between five and ten indicates a poor prognosis based on the DNA of the cancerous cells as compared to other cancerous prostate cells. *Id.* Based on the biopsy results and elevated PSA levels, Dr. Telle recommended a CT abdomen and pelvis scan with contrast and a whole-body nuclear medicine bone scan. *Id.* at 136.

On July 6, 2021, a BOP provider wrote an administrative note reviewing McPeek's recent cancer diagnosis. *Id.* at 26. Based on Dr. Telle's recommendations, the provider scheduled the scans with a target date of August 11, 2021, with priority listed as urgent. *Id.* The provider also recommended a follow-up appointment with the offsite treating urologist following completion of the scans, with a target date of November 1, 2021. *Id.* This was also listed as urgent. *Id.*

McPeek underwent the scans on July 23, 2021. *Id.* at 117. The CT scan showed "[n]o definite metastatic disease," but found "[m]ild nodular thickening of the left adrenal gland [that] is nonspecific." *Id.* at 118. The whole-body bone scan showed no "bone scan evidence of metastatic disease or acute fractures." *Id.* at 120. McPeek had a follow-up with BOP Health Services on July 30, 2021. *Id.* at 14. The provider noted that McPeek said "he has some family on the outside who are nurses etc., he would rather go to the VA Hospital system etc. for his care and so on." *Id.* The provider then wrote that McPeek "refused to follow-up with the urologist[,] referencing a care plan," and that

---

[12] *Id.*

[13] "The ProstaVysion test looks at the DNA level of genes shown to be important in prostate cancer and tests the risk of progression of your cancer independent of the Gleason score." Doc. 66-3 at 134. It "is a measure that indicates how aggressive the cancer is likely to be, based on what usually happens with cells that look like yours." *Id.*

8

McPeek "had an appointment; HE REFUSED." *Id.* (emphasis in original). The Health Services note ended by saying that McPeek has a "[h]istory of prostate cancer, refusing local treatment at this time." *Id.* at 16.[14]

At an appointment on August 2, 2021, Dr. Telle explained his diagnosis and the treatment options. Doc. 66-3 at 113-15. McPeek decided to treat his prostate cancer with external beam radiation therapy and Dr. Telle noted that he would have to see a radiation oncologist. *Id.* at 115. The next BOP Health Services note is dated September 10, 2021, in which a BOP provider wrote that McPeek decided "he is going to go ahead and take the radiation pellets as a form of treatment while he is here until he gets to the outside, back to the veterans [h]ospital." *Id.* at 10. The note concluded with a statement that "WE WILL NEED TO ADD CHRONIC CARE GENERAL FOR PROSTATE CANCER HISTORY WITH RADIATION PELLETS TREATMENT." *Id.* at 11 (emphasis in original).

As of that time, McPeek had not seen a radiation oncologist and the decision to treat his prostate cancer with radiation pellets does not match Dr. Telle's statement that McPeek preferred to treat his cancer with external beam radiation therapy. Confusingly, a BOP provider then reviewed Dr. Telle's August 2, 2021, note on September 21, 2021. *Id.* at 9. The provider made an administrative note that McPeek "PREFERS EXTERNAL BEAM RADIATION THERAPY." *Id.* (emphasis in original). Almost two months after the appointment in which Dr. Telle explained that McPeek needed to see a radiation oncologist to start his prostate cancer treatment, the BOP noted that it had to schedule a radiation oncology appointment and set a scheduled target date of October 8, 2021. *Id.*

---

[14] In his brief, McPeek disagrees with the substance of the note from July 30, 2021, a disagreement that is supported by the fact he saw Dr. Telle for a follow-up appointment three days later, on August 2, 2021. *Id.* at 113; Doc. 66 at 11.

McPeek did not see a radiation oncologist until October 12, 2021. *Id.* at 109. On that date, Dr. Ackley reviewed McPeek's clinical history from July and August, noted that McPeek's Gleason score was 3+3=6, and wrote:

> His disease was predominantly in the right gland and involved the apex, midgland and base. There was also a small amount of disease noted in the left apex and base.

*Id.* at 109, 111. After a physical examination, Dr. Ackley noted that McPeek had "some nodularity in the right side of his prostate." *Id.* at 110. Dr. Ackley explained that McPeek "has a stage II (T2cN0M0) grade group 1 adenocarcinoma of the prostate with a PSA level of 10.13." *Id.* He reviewed multiple different treatment options with McPeek and noted that "he is a candidate is [sic] for the radioactive seed implant. This should offer a good potential of curing his disease." *Id.* McPeek elected to proceed with radioactive seed implant. *Id.* at 111.

McPeek had a Chronic Care Clinic (CCC) visit with BOP Health Services on October 18, 2021. *Id.* at 2. The note from this visit states that McPeek "recently saw hematology oncology with recommendation for local treatment and use a radiation seed implants. [McPeek] verbalized he would like to stay here as a specialist said he could get radiation seed implants here." *Id.* at 2. The BOP provider also stated the facility was "[a]waiting radiation oncology treatment plan." *Id.* The provider requested a radiation oncology appointment "for initiation of radiation oncology treatment for radiation seed implants and medical monitoring." *Id.* at 4. This offsite consultation was given a target date of November 16, 2021. *Id.* The provider noted that "there may be some confusion related to the patient stating his application for compassionate release however he may not have sufficient time served. Patient desires to have local treatment." *Id.* Thus, the BOP requested an offsite radiation oncology consultation and also scheduled McPeek for future CCC follow-up appointments in January, April, and October of 2022. *Id.*

10

The only medical record in McPeek's file following this CCC visit is an administrative review note from November 10, 2021, stating that McPeek had a CT scan, which had occurred months earlier and had previously been discussed and reviewed by other providers. *Id.* at 1. In its response to McPeek's motion, the Government was not able to explain this, stating that it had "received medical records from BOP on or about December 8, 2021, but the most recent record provided was dated November 10, 2021, prior to what appears to be [McPeek's] first scheduled radiation oncology treatment." Doc. 67 at 8, n.3. The lack of medical records seems to be the reason that the Government, in its initial response to McPeek's motion, requested that I "consider not currently interfering (per a release order) with the BOP's medical treatment plan for [McPeek's] prostate cancer, but consider delaying (for a short period of time) any ruling until receipt of additional medical records and/or other information regarding the execution of [McPeek's] medical treatment plan with [the] BOP." *Id.* at 9-10.

On January 4, 2022, the Government filed its supplemental resistance, along with additional medical records and apparent email messages from FCC Terre Haute. Doc. 69. The medical records include a Health Services sick call note dated December 13, 2021, concerning McPeek's complaint that he was starting to have pain in his prostate. Doc. 69-1 at 2. He scored his pain at a five and stated that this pain had been ongoing for one month. [15] *Id.* The only listed result from this sick call was a "Sick Call/Triage" for genital pain to be evaluated by a provider on a scheduled date of December 27, 2021. *Id.* There is no further medical documentation following this Health Services note date except for a medication renewal request dated December 17, 2021. *Id.* at 1.

---

[15] "Prostate cancer that spreads to the bones can cause pain and broken bones. Once prostate cancer has spread to other areas of the body, it may still respond to treatment and may be controlled, but it's unlikely to be cured." Prostate Cancer, Mayo Clinic (last visited Jan. 10, 2022), https://www.mayoclinic.org/diseases-conditions/prostate-cancer/symptoms-causes/syc-20353087. However, "[p] rostate cancer that's detected early — when it's still confined to the prostate gland — has the best chance for successful treatment." *Id.*

As for the email messages, the Government supplied them in what seems to be a cut-and-paste format, with message text being included along with the Government's representations as to when and why they were sent. Docs. 69-2; 69-3. It is unclear who authored those representations. In any event, one of the emails appears to have been sent by FCC Terre Haute provider Dr. Lukens and states:

> The patient had a scheduled date when the appointment for radiation [t]reatment evaluation was made, as a target date/ request for services by a certain date or time, of November 16, 2021-- This did not happen yet. (URC – utilization review committee review and approval, then Naphcare coordination of scheduling with the outside Medical care providers/ facilities with their earliest date available to the target date).

> There would not be a Clinical Encounter note yet from that date because the appointment has not yet taken place; either before the November requested date and/or the appointment is pending as listed in the email chain for April of this year.

> The December 13, 2021 visit with the Nurse, the medical note was actually on 17 December. The patient was signed up for sick call it appears, the administrative note renewed the medication, and the patient has not been reevaluated for the general complaint of pain in his prostate area, which was listed on December 13. A sick call is listed for 12-27-21 which has not yet happened, and he has a follow up with me on or before the 19th of January 2022.

> The future dates of clinical specialty care provider interaction for additional services are listed in this email traffic.

> My note will be available after I see him this month.

Doc. 69-3. The Government also provided the text of an apparent email message from FCC Terra Haute's Onsite Medical Scheduler, Tiffany White, which states:

> Good morning! I am back from vacation now. I'm not sure if you already have this info or not. This [patient] was evaluated most recently by urology on 08-02-2021 and radiation oncology on 10-12-2021. They have provided the following future [appointments] so far:

> 03-10-2022 [pre-operative appointment] with urology

12

03-16-2022 PROCEDURE 1 OF 2 … US & VOLUME STUDY … WITH DR. TELLE & DR. ACKLEY

04-13-2022 PROCEDURE 2 OF 2 … SEED IMPLANT … WITH DR. TELL[E] & DR. ACKLEY

Doc. 69-2 (emphasis and ellipses in original). Based on these new exhibits, the Government requests that I "carefully consider [McPeek's] motion, but ultimately deny the motion at this time, or delay ruling thereon, due to pending/scheduled medical treatment for [McPeek's] current medical conditions and a lack of sufficient information of any contrasting medical treatment plan for the defendant, if released pursuant to his motion." Doc. 69 at 1.

### 2. *Analysis*

McPeek argues that both his prostate cancer diagnosis and the delay in his treatment within the BOP constitute extraordinary and compelling circumstances. Doc. 66 at 12. He points out that the Government's most recent exhibits do not "inspire confidence in the BOP's projected treatment date" and the timing of the recent updates "suggests that [they] were written in response to the instant litigation." Doc. 71 at 1-2. The timing also reflects that "the scheduling of Mr. McPeek's prostate cancer treatment was delayed, at least in part, by the scheduler's vacation [over the holidays]." *Id*. at 2. McPeek also argues that his cancer has progressed while the BOP has delayed his treatment with nothing more than a vague explanation of "utilization review committee review and approval, then Naphcare coordination of scheduling with the outside [m]edical care providers with their earliest date available to the target date."[16] *Id*. at 2.

---

[16] The Government does not explain what a utilization review committee considers or what Naphcare is. A website for Naphcare states that it partners with government agencies "to provide innovative healthcare, technology and administrative solutions for complex problems within the correctional and justice systems." *See* About Naphcare, https://www.naphcare.com/about (last visited Feb. 9, 2022).

In addition, McPeek notes that he has reported prostate pain, which he rated at a pain level of five and that he has been experiencing for the past month. *Id.* at 2. He reported this pain a month after the BOP's original scheduled target date of November 16, 2021, for his cancer treatments to commence. *Id.* at 2-3. He asserts that "cancer treatment should start very soon after diagnosis"[17] and argues that he would be better able to address his serious diagnosis if he were no longer subject to the BOP's delays and could, instead, receive treatment at the VA hospital. *Id.* at 1-3.

The Government's responses to McPeek's motion are inconsistent. In its initial filing, the Government stated that McPeek's "medical conditions appear to be able to be appropriately managed while he is in BOP custody." Doc. 67 at 6. The Government further stated that, "the court could find defendant is 'suffering from a serious physical or medical condition,' USSG §1B1.13, comment. (n.1(A)(ii)), or that he has demonstrated an extraordinary and compelling reason permitting compassionate release." Doc. 67 at 9. But the Government concluded that early release would be "interfering (per a release order) with the BOP's medical treatment plan for [McPeek's] prostate cancer." Doc. 67 at 9. At the time of this assertion, the only medical records supplied to the court showed that the target date to start McPeek's treatment was November 16, 2021.

The Government correctly pointed out that prostate cancer is "a serious, but treatable medical condition," while also explaining that the Government does not know why the BOP had not yet started to treat McPeek's cancer. *Id.* at 6-7. The Government suggested that McPeek's own uncertainty about starting radiation therapy while in BOP custody could have been a cause for the delay. *Id.* at 9. As discussed above, however,

---

[17] <u>Understanding the Cancer Experience When You're a Caregiver</u>, American Cancer Society (June 6, 2016), https://www.cancer.org/treatment/caregivers/what-a-caregiver-does/treatment-timeline.html.

that suggestion was premised on a provider note that does not appear to be consistent with other information in the record. *See* Doc. 66-9 at 16, 113.

Of course, the records provided with the Government's supplemental response show the BOP missed its target date of November 16, 2021, for starting McPeek's treatment. There is no explanation for this delay other than an exhibit with a passing reference to a utilization review committee and Naphcare. *See* Doc. 69; Doc. 69-3. Instead, the Government argues that the two purported emails from BOP employees are sufficient to show that the BOP now has a treatment plan in place that is more reliable than McPeek's plan for care at the VA hospital. *Id.* at 1.

I have previously found that a cancer diagnosis may constitute an extraordinary and compelling circumstance. *United States v. Schmitt*, No. CR12-4076-LTS, 2020 WL 96904, at *3-4 (N.D. Iowa Jan. 8, 2020) (granting compassionate release to a defendant with stage four metastatic breast cancer); *United States v. Smith*, 464 F. Supp. 3d 1009, 1018-20 (finding that stage IIIA non-small cell lung cancer alone could constitute an extraordinary and compelling reason and granting compassionate release); *United States v. Valenzuela-Ruiz*, CR14-4009-LTS-1, Doc. 151 (granting compassionate release to a defendant with stage IV metastatic prostate cancer after the Government agreed that such a diagnosis justified compassionate release); *see also United States v. Saccoccia*, 10 F.4th 1, 6 (1st Cir. 2021) (affirming denial of compassionate release based solely on an elevated PSA level but stating defendant could refile his compassionate release motion if he were diagnosed with prostate cancer); *United States v. Clark*, 854 Fed. App'x 71, 71, 73 (7th Cir. 2021) (accepting the district court's finding that a defendant's cancer, asthma and risk of COVID-19 complications constituted extraordinary and compelling circumstances, but affirming the district court's denial of compassionate release pursuant to the sentencing factors). Based on the medical evidence described above, I find that McPeek's cancer diagnosis is an extraordinary and compelling circumstance that could justify compassionate release.

A second issue is the delay in treatment. Other courts have found that BOP delays in treatment of serious disorders can constitute or contribute to finding extraordinary and compelling circumstances. *Saccoccia*, 10 F.4th at 6 (explaining that "a district court may find the existence of an extraordinary and compelling reason sufficient to justify compassionate release based upon material BOP interference in or stonewalling of medical testing or treatment"); *United States v. Beck*, 425 F. Supp. 3d 573, 574-77, 580-82 (M.D.N.C. 2019) (granting compassionate release after a series of delays prevented Beck from receiving chemotherapy for metastatic breast cancer because it was "too late"); *United States v. Rodriguez*, 424 F. Supp. 3d 674, 675-76 (N.D. Cal. 2019) (stating that the court would have granted compassionate release due to "the BOP's mind-boggling conduct" if the Government had not transferred Rodriguez to a Residential Reentry Center); *United States v. York*, Nos. 3:11-CR-76; 3:12-CR-145, 2019 WL 3241166, *2-4, 6 (E.D. Tenn. July 18, 2019) (describing the BOP's inability to properly care for York, a diabetic and wheelchair-bound amputee suffering from congestive heart failure and acute kidney failure, but not explicitly relying on the BOP's failures in finding extraordinary and compelling circumstances); *United States v. Bandrow*, 473 F. Supp. 3d 778, 786-87 (E.D. Mich. 2020) (granting compassionate release in part due to a BOP facility's failure "to provide Bandrow with the CT urogram and urology consultation he needs"); *United States v. Almontes*, No. 3:05-cr-58 (SRU), 2020 WL 1812713, at *1, *6-7 (D. Conn. Apr 9, 2020) (granting compassionate release to a defendant in danger of becoming paralyzed without spinal surgery as soon as possible when the BOP continuously delayed treatment for several years); *United States v. Iezzi*, No. 2:17-cr-00157, 2020 WL 4726582, at *2-3, 7-8 (W.D. Pa. Aug. 14, 2020) (describing Iezzi's stage IV kidney disease, his possible need for dialysis, and the fact that the court was not aware of the progress of Iezzi's kidney disease because he had not seen a nephrologist since the COVID-19 pandemic began as contributing to its finding of extraordinary and compelling circumstances).

Here, the BOP first became aware of McPeek's elevated PSA level on January 14, 2021, and McPeek notified the BOP of his need to frequently urinate at night on March 4, 2021. Doc. 66-3 at 101; 51. McPeek was not seen by a specialist until April 27, 2021. *Id.* at 145. As of the last filing in this case, it appears that McPeek still had not received any treatment for his prostate cancer, which was formally diagnosed on July 6, 2021. *Id.* at 136. During this delay, McPeek has experienced additional symptoms. Further, the ProstaVysion score of six indicates that McPeek may have a poor prognosis based on the DNA of his cancer cells. I find that the BOP's delay in treating McPeek's prostate cancer is a separate extraordinary or compelling circumstance that could justify granting compassionate release.

**C.      *Section 3553(a) Factors and Danger to Community***

The more difficult issue is whether the § 3553(a) factors support releasing McPeek only two years after he was sentenced. Guideline § 1B1.13(2) provides that compassionate release is appropriate only when "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." Additionally, § 3582(c)(1)(A) requires a court to consider the factors set forth in 18 U.S.C. § 3553(a) before granting a motion for compassionate release. The § 3553(a) factors are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

17

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

   (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines [issued by the Sentencing Commission . . .;]

(5) any pertinent policy statement [issued by the Sentencing Commission . . .;]

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

The § 3553(a) factors that weigh most-heavily against McPeek's release are the nature and circumstances of his offense, his criminal history, and the limited length of time he has served. McPeek acknowledges the aggravating nature of his offense conduct (distributing methamphetamine within a protected location while possessing a firearm). Doc. 66 at 13. The Government argues that "[t]he factors militating against a sentence reduction could outweigh [McPeek's] asserted medical concerns." Doc. 67 at 12. The Government relies mainly on McPeek's offense conduct of participating in a conspiracy to obtain and sell methamphetamine and his involvement in selling firearms from his home. *Id.* at 10. Based on that conduct, the Government argues that McPeek is still a danger to the community. *Id.* The Government also points to several of McPeek's dated convictions, while recognizing that his Criminal History Category was II at sentencing. *Id.* at 11. The only conviction that scored criminal history points was a felony drug trafficking conviction from 2001. Doc. 37 at 18.

As noted above, I sentenced McPeek to 84 months' imprisonment. *Id.* He has served approximately 30 months of that sentence. *See* Doc. 66-7 at 3. In addition to noting that a significant portion of the sentence remains unserved, the Government points to the lack of specificity in McPeek's release plan and asserts that his "medical conditions have been and may well be able to be appropriately managed at his BOP facility." *Id.* at

18

11-12. Specifically, the Government states that McPeek has not included any details about timing or procedures to be done at the VA hospital, and thus theorizes that "due to the need for a second assessment and/or review of current medical records, some amount of a delay in such outside BOP treatment is likely, but exactly unknown." *Id.* at 11.

Other § 3553(a) factors are mitigating. McPeek's criminal history largely tracks his traumatic life experiences and subsequent addiction struggles. He served in the United States Army from October 8, 1976, to October 19, 1979, and was honorably discharged. Doc. 37 at ¶ 83. When McPeek was 30 years old, his daughter "received severe burns over 64% of her body during a house fire." *Id.* at ¶ 73. During this time, he started fighting with his then-wife and began binge-drinking on a daily basis. *Id.* He also used marijuana on a biweekly basis and eventually transitioned to experimenting with methamphetamine at the age of 40. *Id.* at 74-75.

McPeek's criminal convictions began at age 30 and continued until his arrest on state felony drug charges in 2000. *Id.* at ¶¶ 36-48. They included drug-related offenses along with theft, attempted burglary, possession of burglar's tools to break into vending machines, operating while intoxicated and various other driving-related offenses. *Id.* at ¶¶ 36-47. As a result of his 2001 drug-related conviction, he was sentenced to ten years' imprisonment and was released on parole in 2002. *Id.* at ¶ 48.

In 2004, McPeek became the Chief Engineer for the Sioux City Hotel and Convention Center. *Id.* at ¶ 84. He successfully completed supervision in 2006 and received no further convictions until this offense, which occurred in 2017 and 2018. *Id.* McPeek maintained his employment until he retired in 2013 to care for his ailing mother, who later died of cancer-related health complications. *Id.* at ¶¶ 59, 75, 84.

In 2014, during his period of sobriety, McPeek was charged with simple assault based on an incident in which he allegedly "slapped his 12-year-old daughter, which caused a small cut to the inside of her lower lip." *Id.* at ¶ 57. The charge was ultimately dismissed. *Id.* McPeek's daughter later "was placed in foster care at age 14 because she was rebellious of [McPeek's] very strict household." *Id.* at ¶ 64. At the time of the

19

PSIR, she was residing with McPeek's daughter from a prior marriage and McPeek noted that he still had daily contact with her. *Id.* at ¶¶ 62, 64.

At some point after the alleged 2014 incident, McPeek's son Timothy began suffering complications from hepatitis C. *Id.* at ¶ 62. McPeek took care of his son and assisted him with everyday living until he passed away on May 21, 2017. *Id.* at ¶¶ 62, 75. After the death of his son, McPeek relapsed and started using marijuana and methamphetamine daily until his arrest for the instant offense in 2019. *Id.* at ¶¶ 74-75. From July 2017 to December 2018, McPeek sold methamphetamine out of his home, which was within 1,000 feet of a public playground. Doc. 37 at ¶¶ 6, 8-9, 10. In a post-*Miranda* interview, McPeek admitted to receiving methamphetamine from co-conspirators and redistributing it to others. *Id.* at ¶ 11. Multiple co-conspirators proffered that McPeek carried a firearm and would trade firearms for methamphetamine or give firearms as collateral. *Id.* at ¶¶ 12-15. At sentencing, McPeek withdrew his objection to a paragraph in the PSIR that detailed his possession of a .40 caliber Glock handgun for protection. *Id.* at ¶¶ 9, 20.

While serving his sentence in this case, McPeek completed his GED and a drug education program while participating in a variety of other classes. Doc. 66-4 at 1-2. While it is unclear whether McPeek had prior work assignments, he began work in the sheet metal shop on August 2, 2021. *Id.* at 1. He has continued to work at the metal shop even after being placed in Chronic Care Level 4, which is the highest level of medical treatment within the BOP. Doc. 66 at 12. McPeek has not received any disciplinary reports. Doc. 66-6. Additionally, he has served part of his sentence while dealing with symptoms of prostate cancer and anxiety from his cancer diagnosis, meaning his sentence may have been more laborious than those served by most other inmates. *See, e.g., Beck*, 425 F. Supp. 3d at 586; *United States v. McGraw*, No. CR02-00018, 2019 WL 2059488, at *5 (S.D. Ind. May 9, 2019).

McPeek's release plan is to live with his wife, "who is not a felon and who has no firearms in her home." Doc. 66 at 13. She is able to assist McPeek "in attending all

medical appointments at the VA hospital in Sioux Falls or Iowa City." *Id.* Defense counsel has "spoken with Brian Brooks, the re-entry coordinator for Veterans Affairs in Sioux Falls," who determined that McPeek is eligible for veterans' benefits and that he would likely be treated at the Sioux Falls VA Hospital. Doc. 68. McPeek lists Michaela Gasca as his point-of-contact for VA service and states that he could "contact her from the BOP to get a head-start on the process of securing treatment in the free world." *Id.* Finally, McPeek states that "treatment options through the VA demonstrate that [he] will very likely receive treatment for his prostate cancer at the Sioux [Falls] VA before he receives any treatment from the BOP [with BOP treatment] beginning on April 13, 2022." Doc. 71 at 1.

While cognizant of McPeek's criminal history and his offense conduct in this case, I find that in light of his age and cancer diagnosis, and his lack of convictions for violent conduct, his early release would not pose a danger to the public. McPeek was able to sustain his sobriety following his 2001 drug felony conviction and was not convicted of any crimes between 2002 and the unfortunate death of his son in 2017. Further, McPeek will be subject to supervised release for six years and is on notice that any return to substance abuse or criminal conduct, and any other violations of the conditions of supervision, will result in his prompt return to prison. This reduces whatever risk he may otherwise pose to the public. *See Schmitt*, 2020 WL 96904, at *5.

Releasing McPeek under these unusual circumstances (his post-sentencing cancer diagnosis, estimated poor prognosis and delay in radiation treatment) will not undermine the goal of deterrence. Nor will early release create unwarranted sentencing disparities, as it accounts for McPeek's particular medical circumstances. *See United States v. Smith*, 464 F. Supp. 3d 1009, 1025 (N.D. Iowa 2020); *United States v. Carroll*, No. CR17-1039-LTS, 2021 WL 2548082, at *8 (N.D. Iowa June 22, 2021). Compassionate release at this time will still reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence to criminal conduct and protect the

public from further crimes. Thus, after considering all of the applicable factors, I find that McPeek is eligible for compassionate release and will therefore grant his motion.

## V. CONCLUSION

For the foregoing reasons:

1. Defendant Bradley Eugene McPeek, Sr.'s motions (Docs. 51, 65) for compassionate release are **granted**.

2. Execution of this order is **stayed** for twenty-one (21) days from the date of this order to allow the Bureau of Prisons and United States Probation an opportunity to make the necessary arrangements for McPeek's release.

3. Based on the stay of execution described in the preceding paragraph, McPeek's term of imprisonment is hereby reduced to time served as of March 4, 2022.

4. All other aspects of the judgment (Doc. 45) remain in effect, including those related to McPeek's term of supervised release.

5. The Clerk's office shall provide a copy of this order to United States Probation and the institution where McPeek is incarcerated.

**IT IS SO ORDERED.**

**DATED** this 11th day of February, 2022.

_____
Leonard T. Strand, Chief Judge